UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SERGIO P. CORREIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:16-cv-30153-KAR |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S FIRST MOTION FOR
ORDER REVERSING THE COMMISSISIONER'S DECISION, AND THE DEFENDANT'S
MOTION TO AFFIRM THE COMMISSIONER'S DECISION
(Dkt. Nos. 14, 21)
September 29, 2017

ROBERTSON, U.S.M.J.

I.        Introduction

On September 9, 2016, plaintiff Sergio P. Correira ("Plaintiff") filed a complaint

pursuant to 42 U.S.C. § 405(g) against the Acting Commissioner ("Commissioner") of the Social

Security Administration ("SSA"), appealing the denial of his claims for Supplemental Security

Income ("SSI") and Social Security Disability Insurance ("SSDI").  Plaintiff asserts that the

Commissioner's decision denying him such benefits – memorialized in a February 22, 2016

decision by an administrative law judge ("ALJ") – is in error.  Specifically, Plaintiff alleges that:

(1) the Appeals Council's remand of the case to the ALJ following an initial fully favorable

decision was arbitrary and capricious, and the ALJ was improperly influenced by the fact of

remand to issue an unfavorable decision; (2) the ALJ's decision was not supported by substantial

evidence; and (3) the ALJ failed to accord appropriate weight to an unidentified mental health

care provider's treatment records. By his motion, Plaintiff seeks a judgment on the pleadings

that the Commissioner's decision be reversed or remanded (Dkt. No. 14). The Commissioner

has moved for an order affirming her decision (Dkt. No. 21). The parties have consented to this

court's jurisdiction (Dkt. No. 13). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the following

reasons, the court DENIES Plaintiff's motion and GRANTS the Commissioner's motion.

II.      Procedural Background

Plaintiff applied for SSI and SSDI on March 12, 2013, alleging a November 27, 2011

onset of disability (Administrative Record ("A.R.") at 340-350).[1] Plaintiff's applications were

denied initially and on reconsideration (*id*. at 198-201, 208-213). Plaintiff requested a hearing

before an ALJ, and one was held on November 13, 2014, at which time Plaintiff claimed

disability due to an amputation of his left arm above the elbow, depression, and anxiety (*id*. at

80, 86, 94, 100, 103). Following the hearing, the ALJ issued a fully favorable decision on

December 8, 2014 (*id*. at 177-190). By a notice dated February 2, 2015, the Appeals Council

notified Plaintiff that it was reviewing the ALJ's decision (*id.* at 301-06). On June 18, 2015, the

Appeals Council vacated the hearing decision and remanded the case to the ALJ with

instructions (*id.* at 193-97). In accordance with those instructions, the ALJ held a second hearing

on December 8, 2015 (*id.* at 46-79). On February 17, 2016, the ALJ issued a decision denying

Plaintiff's claims (*id.* at 23-45). The Appeals Council denied review, and the ALJ's February 17,

2016 unfavorable decision became the final decision of the Commissioner (*id*. at 1-6). This suit

followed.

---

[1] The Commissioner represents that Plaintiff's applications received a protective filing date of
December 7, 2011 (Dkt. No. 22 at n.2).

III.    <u>Legal Standards</u>

A.    <u>Standard for Entitlement to Social Security Disability Insurance</u>

In order to qualify for SSI and SSDI, a claimant must demonstrate that he is disabled within the meaning of the Social Security Act.[2]  A claimant is disabled for purposes of SSI and SSDI if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A); 42 U.S.C. § 423(d)(1)(A).  A claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 1382c(a)(3)(B); 42 U.S.C. § 423(d)(2)(A).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated under each statute.  *See* 20 C.F.R. § 416.920; 20 C.F.R. § 404.1520.  The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience.  *See id.*  *See*

---

[2] For SSDI, the claimant also must demonstrate that the disability commenced prior to the expiration of his insured status for disability insurance benefits.  *See* 42 U.S.C. § 423(a)(1).

*also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process). If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step. 20 C.F.R. § 416.920; 20 C.F.R. § 404.1520.

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's "residual functional capacity" ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work. *See id*. "RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, *Goodermote*, 690 F.2d at 7, including the burden to demonstrate RFC. *Flaherty v. Astrue*, 2013 WL 4784419, at *9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). At step five, the Commissioner has the burden of showing the existence of other jobs in the national economy that the claimant can nonetheless perform. *Goodermote,* 690 F.2d at 7.

B. Standard of Review

The District Court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. § 1383(c)(3); 42 U.S.C. § 405(g). Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v.*

*Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). The court reviews questions of law *de novo*, but must defer to the ALJ's findings of fact if they are supported by substantial evidence. *Id*. (citing *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir.1999)). Substantial evidence exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion.'" *Irlanda Ortiz v. Sec'y of Health & Human Servs*., 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs*., 647 F.2d 218, 222 (1st Cir. 1981)). In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *Id*. So long as the substantial evidence standard is met, the ALJ's factual findings are conclusive even if the record "arguably could support a different conclusion." *Id*. at 770. That said, the Commissioner may not ignore evidence, misapply the law, or judge matters entrusted to experts. *Nguyen*, 172 F.3d at 35.

IV.    Discussion

A.  Relevant Background

1.  Mental Health Records Submitted Prior to December 8, 2014

The evidence related to Plaintiff's mental health from November 27, 2011, the alleged onset date, to December 8, 2014, the date of the favorable decision, included treatment records from Advocates Community Counseling ("ACC"), reports of two in-person consultative examinations, and a report from Horace Lukens, Ph.D., a non-examining, non-testifying mental health care professional for the state Disability Determination Services ("DDS").

a.  ACC Records

Plaintiff initiated counseling at ACC with therapist Gail Wall in or around September 2012 (A.R. at 594, 618). The records of counseling, which continue through the end of January

2013 on a fairly regular basis, reflect the topics which Plaintiff and Ms. Wall discussed. These records include a diagnostic code for dysthymic disorder, or persistent depressive disorder, but do not contain an assessment of the severity of Plaintiff's diagnosed mental health impairment, nor do they discuss any functional limitations attributable to the diagnosis (*id.* at 600-618). The records indicate that Plaintiff began taking Celexa in or around December 2012 (*id.* at 607), and ceased taking it some three weeks later because of side effects (*id.* at 600).

Julie Marhefka, an advanced practice registered nurse, evaluated Plaintiff on October 12, 2012 for purposes of prescribing medication (*id.* at 594). She saw Plaintiff for evaluation or treatment four times between October 12 and December 31, 2012 (*id.* at 591-96). Ms. Marhefka assessed Plaintiff's appearance, speech, alertness, attention, and memory as normal. He was not delusional. The records show that his mood was depressed, and he reported that his appetite, energy, and interests had decreased. Ms. Marhefka prescribed Celexa in December 2012 (*id.* at 592), and assigned Plaintiff a score of 50 on the Global Assessment of Functioning Scale ("GAF") on each of the four occasions on which she treated him (*id.* at 591-93, 596).[3]

In late June and early July 2013, Plaintiff saw Barbara Sachs, M.A., at ACC (*id.* at 569, 599). It appears that initially Plaintiff's treatment with Ms. Sachs was for group substance abuse counseling required as a term of Plaintiff's probation (*id.* at 588, 660). On June 27, 2013, Ms. Sachs completed an adult comprehensive assessment of Plaintiff, in which she indicated that

---

[3] The GAF scale was designed to provide a rough estimate of an individual's psychological, social, and occupational functioning. *See Bourinot v. Colvin*, 95 F. Supp. 3d 161, 178 (D. Mass. 2015) (citing *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998)). As a result of concerns about the GAF scale's subjectivity and the basis of scores, the American Psychiatric Association abandoned the GAF scale in the fifth and most recent edition of the Diagnostic and Statistical Manual of Mental Disorders. *See id.*; *see also, e.g., Kroh v. Colvin*, No. 13-CV-01533, 2014 WL 4383675, at *17 (M.D. Pa. Sept. 4, 2014).

Plaintiff's appearance, eye contact, speech, emotional state/mood, facial expression, perception, thought content and process, orientation, memory, and judgment were within normal limits. She described his behavior as relaxed and cooperative (*id.* at 575, 580). On July 11, 2013, Ms. Sachs recorded Plaintiff's self-assessment. He indicated that his strengths were that he was optimistic and a hard worker. He was able to take care of himself and his apartment (*id.* at 582).

In December 2013, Plaintiff began treating on an intermittent basis with Jaime Eckert, MSN (Master of Science in Nursing), RN/PC, who initially diagnosed Plaintiff with recurring depression of moderate severity, prescribed Zoloft, and assessed a GAF score of 55 (*id.* at 654). In February 2014, Ms. Eckert's diagnosis was recurrent depression of mild to moderate severity; she assessed a GAF score of 58 and observed that Plaintiff was responding well to a trial of Zoloft (*id.* at 657).

b.  Opinion Evidence

Clinical psychologist Peter Jaffe, Ph.D., conducted a clinical diagnostic interview with Plaintiff on August 19, 2013. Plaintiff was referred to Dr. Jaffe by the University of Massachusetts Disability Evaluation Services as part of Plaintiff's application for Massachusetts benefits. Dr. Jaffe diagnosed posttraumatic stress disorder, dysthymic disorder, and panic disorder without agoraphobia (*id.* at643- 646). Mr. Jaffe opined that, primarily due to Plaintiff's physical condition, there were restrictions on his daily living activities and he was not yet able to be competitively employed. Dr. Jaffe assessed a GAF score of 51 (*id.* at 646).

Neuropsychologist Kaaren Bekken, Ph.D., conducted a consultative examination with testing of Plaintiff on September 17, 2013. Dr. Bekken observed that Plaintiff was well-groomed, friendly, and fully cooperative. His thought processes appeared to be fully intact and his behavior was normal. Ms. Bekken diagnosed depression (reported to be severe based on

Plaintiff's score on a self-report depression checklist) with PTSD-like symptoms. Dr. Bekken estimated Plaintiff's GAF score at 50. She attributed the GAF score to the loss of his arm, depression, and recent substance abuse history (*id.* at 647-49).

A mental RFC worksheet completed on September 14, 2013 by Tom Pelletier, Sc.D., contained findings that Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration to sustain employment; work at a consistent pace; and interact appropriately with the general public. Mr. Pelletier otherwise indicated that Plaintiff was slightly limited, or was not limited, by the effects of his depression and possible PTSD (*id.* at 640).

Horace Lukens, Ph.D., the non-examining DDS physician, supported a finding of non-disabled based on his review of the records and Dr. Bekken's consultative examination. Dr. Lukens' assessment of Plaintiff's mental RFC was that Plaintiff did not have understanding and memory limitations. He had limitations in sustained concentration and persistence, and would likely have moderate difficulty in carrying out instructions and sustaining attention, concentration, and pace due to physical limitations and the effect of depression (*id.* at 161). Dr. Lukens also found that Plaintiff would have social interaction limitations. He concluded that Plaintiff was not significantly limited in his ability to interact appropriately with the general public or in his ability to ask simple questions or ask for assistance, but was likely to have moderate difficulty interacting with co-workers and supervisors because of depression (*id.* at 161-62).

2. Testimony at November 4, 2014 Hearing

Plaintiff was 24 years old on November 27, 2011, the date of the alleged onset of his disability, which was the date of the automobile accident in which he lost his arm (*id.* at 85-86).

8

He had a ninth grade education and had usually had jobs performing manual work (*id.* at 98-99). He had also worked as a cashier for several employers (*id.* at 98).

When asked to describe his typical day, Plaintiff said he usually went to bed really late because of insomnia and got up around 1:00 or 2:00 p.m. He would then pretty much do nothing. He would lie in bed all day, or sometimes watched TV with his father. His mother helped him dress and cooked for him. He could lift light weights with his right arm, but using his right arm exclusively was exhausting. He could walk, but not for that long, because his balance was impaired by the loss of his left arm. He could stand for about an hour and sit for an hour to an hour and a half, then his back would start to hurt. He had problems with reaching. He had not tried to work since the accident. He was so depressed and anxious that he did not want to see anyone. He did not socialize with anyone outside of his family. He testified that the Zoloft he was taking made him drowsy and lightheaded. He had trouble with his memory, and could not really concentrate. He got really frustrated and angry because of the way he looked (*id.* at 91-115).

The ALJ asked the vocational expert ("V.E.") to assume someone of the same age, education, and work history as Plaintiff, who was able to lift 20 pounds occasionally and 10 pounds frequently with his right hand, who could stand and walk for 6 hours in an 8-hour day and sit with normal breaks for 6 hours in an 8-hour day. The individual was unable to reach in any direction with his left arm, and could not handle, finger, or feel with his left arm or hand. He could occasionally climb, balance, stoop, kneel, and crouch, but could never crawl or climb a ladder. He had to avoid concentrated exposure to hazards and was limited to occasional interaction with the public, co-workers, or supervisors, and to the performance of simple, routine, and repetitive instructions.

The V.E. testified that such an individual could not perform Plaintiff's past work at all. After some thought, the V.E. testified that such an individual could work as a surveillance systems monitor, a position of which there were 8,500 in the country and 191 in Massachusetts, or he could work as an addresser or a callout operator, which is a position in which an employee uses a telephone and relays information about people who are applying for credit cards (*id.* at 116-18). Asked to assume the prior criteria with the addition that the individual would miss two days or more of work each month, the V.E. testified that such an individual would be unemployable (*id.* at 118-19).

### 3. Relevant Portions of the ALJ's First Decision

In the ALJ's fully favorable decision, issued on December 8, 2014, the ALJ's assessment of Plaintiff's RFC was that:

> [t]he claimant has the residual capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant is able to lift twenty pounds occasionally and ten pounds frequently with his right upper extremity. He can stand or walk at least six hours in an eight hour day and he can sit (with normal breaks) about six hours in an eight-hour workday. He has the ability to occasionally climb or balance, stoop, kneel, crouch but never crawl or climb a ladder. He is unable to reach in all directions and he is unable to handle, finger, and feel with his left upper extremity. He must avoid concentrated exposure to hazards. His work is limited to only occasional interaction with the public, co-workers, and supervisors. His work is limited to the performance of simple, routine and repetitive instructions. He would miss two days or more of work each month because of depression.

(A.R. at 187).

In its remand order, the Appeals Council stated, in pertinent part, that the ALJ's decision:

> [did] not contain an adequate assessment of the claimant's maximum residual functional capacity in accordance with the requirements of 20 CFR 404.1545 and Social Security Ruling 96-8p. As indicated in Social Security Ruling 96-8p, the residual functional capacity is a function-by-function analysis of the most an individual is capable of doing, i.e., how much lifting, carrying, standing/walking, sitting, etc. despite his impairments and it must include rationale [sic] that cites specific evidence in the record supporting each

assessed limitation. *In the claimant's case, the key limitation resulting in the finding of disability, that the claimant would miss two days or more a month due to depression, is not supported by substantial evidence. The record does not contain a medical source statement from a qualified medical professional suggesting such a limitation, nor does the objective evidence support it.*

(*id.* at 194) (emphasis supplied).

The ALJ was directed, on remand, to obtain additional evidence concerning Plaintiff's affective and anxiety disorders, including, if warranted and available, a consultative psychological or psychiatric examination and medical source statements about Plaintiff's RFC (*id.* at 195).

4. Mental Health Records Submitted Following Remand

a. Additional ACC Records

Plaintiff's mental health records following remand show an improving mental health status. ACC records of individual counseling session with Ms. Sachs from May 2014 through November 2015 do not assess functional limitations attributable to Plaintiff's depression. Beginning in July 2015, the counseling notes reflect notable improvement in Plaintiff's presentation. The notes reflect, for example, that he had fewer depressive symptoms, and was more upbeat and socially active (*id.* at 790, 792, 794, 796, 798). In August 2015, Plaintiff spoke about being happy in a new relationship and about the prospect of a prosthetic arm (*id.* at 794). Ms. Sachs diagnosed recurrent depression of moderate severity.

Additional records generated by Ms. Eckert, who continued to see Plaintiff for the management of his medications, show that Plaintiff presented appropriately, with normal speech, thought processes, and associations. The diagnosis was depressive disorder, moderate severity. GAF scores ranged from a low of 50 in March 2015, when Plaintiff reported he had just broken up with his girlfriend of eight years, to 55 (October 2014 and August 2015), 54 (April 2015), 57

(January 2015 and October 2015), to a high of 58 (July 2015) (*id.* at 756, 759, 762, 765, 768, 771, 774).

b. Additional Consultative Evaluation

On July 31, 2015, licensed psychologist Lynn Cattanach, Ph.D., conducted a psychological evaluation with testing of Plaintiff (*id.* at 665-670). On the basis of testing, behavioral observations, Plaintiff's history, including his medical history, and his account of his daily activities, Dr. Cattanach diagnosed Plaintiff with depressive disorder not otherwise specified, and recommended ruling out borderline intellectual functioning and personality disorder not otherwise specified (*id.* at 669). As to his daily activities, Plaintiff reported that he spent his time on a typical day at home, sleeping, seeing family, talking with friends by telephone, watching television, connecting to the Internet via his telephone, listening to music, and using a treadmill for half an hour. He avoided going out of the house, and no longer read or engaged in his past hobbies. He could take care of some activities of daily living, including simple meal preparation, using the telephone, counting money, bathing, dressing, climbing stairs, shopping for groceries, and lifting and carrying light loads (*id.* at 667). Dr. Cattanach concluded that, from a psychological perspective, Plaintiff's activities of daily living might be limited in terms of handling funds, concentration, and recall (*id.*).

With respect to Plaintiff's RFC, Dr. Cattanach found that Plaintiff's ability to understand, remember, and carry out simple instructions was intact, while his ability to handle more complex or detailed instructions was moderately limited. She found that he was somewhat limited in his ability to sustain concentration, persistence, and pace for simple work-related tasks over a forty-hour work week with usual supervision; his ability to do work-related activities on a consistent, reliable basis was mildly limited; his ability to respond appropriately to supervision and co-

workers was somewhat limited, and he could tolerate the minimum social demands of simple task setting, but could not tolerate sustained contact with the general public. Finally, she found that he was not limited in his ability to tolerate the usual pressures in a work place and that he could handle simple changes to routine, avoid hazards, arrange travel, and make and carry out simple plans (*id.* at 669).

5. December 8, 2015 Hearing

At the second hearing, the Plaintiff testified that that "they" were now giving him more medication and he felt drowsy and sick. He still never left his house, and did not have the energy or strength to do anything. He was not involved in social activities. It was hard for him to concentrate, he forgot really quickly, and his memory was poor. He had pain in his amputated arm. He did not want to take addictive medication, so he used Tylenol or Aleve (*id.* at 62-67).

A different V.E. testified at the second hearing. The initial hypothetical posed by the ALJ was identical in all relevant aspects to the hypothetical question he posed at the first hearing, and the V.E. opined that such a person would not be able to perform Plaintiff's past work (*id.* at 70-71). On this occasion, the V.E. testified to a single job that such a hypothetical individual could perform, which was surveillance systems monitor, a sedentary, unskilled position of which there were 2,100 in Massachusetts and 997,000 nationally (*id.* at 70-71). The V.E. testified that an individual who would miss 2 days or more of work each month or would be off-task for 20% of the time because of depression would be unemployable (*id.* at 72).

Asked by the ALJ where he believed the evidence of disability was in light of the remand order, Plaintiff's attorney represented that he would be relying on the opinions of the psychiatric counselor, the psychological consultant, and the psychiatric nurse on the ground that what these individuals said was related to Plaintiff's impairments and their severity and his functional

abilities.  The attorney stated that ACC records submitted after remand would show severe

depression.  He admitted, however, that none of the treating sources had provided an opinion

supporting a theory of disability based on a mental impairment (*id.* at 56-60).  The ALJ left the

record open for thirty days after the hearing to give Plaintiff's attorney time to provide records

that could support a finding that Plaintiff would be absent from work for two days a month, or

off task for up to 20% of the time (*id.* at 77).

      6.   The ALJ's February 22, 2016 Decision

The ALJ followed the five-step sequential evaluation process.  At step one, he found that

Plaintiff had not engaged in substantial gainful employment since November 27, 2011, the

alleged onset date.  At step two, he found that Plaintiff had the following severe impairments:

upper left extremity amputation, affective disorder, and anxiety disorder (*id*. at 29).  At step

three, he found that Plaintiff did not have an impairment or a combination of impairments that

met or medically equaled a listed impairment.  He considered the so-called Paragraph B criteria

applicable to mental health impairments, and found that Plaintiff had a mild restriction in

activities of daily living, and moderate difficulties in social functioning and with concentration,

persistence, or pace.  Finally, he found that Plaintiff had not experienced any episodes of

decompensation of extended duration (*id.* at 30).

Before moving to step four, the ALJ found that Plaintiff had the RFC to perform light

work as defined in 20 CFR §§ 404.1567(b) and 416.927(b),[4] except that he could lift up to 20

---

[4] Light work involves lifting no more than 20 pounds at a time with frequent lifting
or carrying of objects weighing up to 10 pounds.  Even though the weight lifted
may be very little, a job is in this category when it requires a good deal of walking
or standing, or when it involves sitting most of the time with some pushing and
pulling of leg or arm controls.  To be considered capable of performing a full or
wide range of light work, you must have the ability to do substantially all of these
activities.  If someone can do light work, we determine that he or she can also do

pounds occasionally and 10 pounds frequently with his upper right extremity. He could stand or walk at least 6 hours in an 8-hour day, and sit with normal breaks for about 6 hours in an 8-hour day. He could occasionally climb, balance, stoop, kneel, crouch, or crawl, but never climb ladders. He was unable to reach in all directions, and was unable to handle, finger, and feel with his upper left extremity. He would need to avoid concentrated exposure to hazards. He was limited as well to occasional interaction with the public, co-workers, and supervisors and to simple, routine, and repetitive tasks. Omitted from this RFC was the limitation that Plaintiff would be expected to be absent from work for 2 days or more per month (*id.* at 31).

At step four, the ALJ found that Plaintiff could not perform any of his past work (*id.* at 38). At step five, considering Plaintiff's age, education, work experience, and RFC, he found that a job that Plaintiff could perform (specifically, the job of surveillance systems monitor) was available in significant numbers in the national economy (*id.* at 39). Accordingly, he concluded that Plaintiff had not been under a disability from November 27, 2011 through the date of his decision (*id.* at 39-40).

B. Plaintiff's Contentions

1. The Appeals Council's Remand Order is Not Reviewable by this Court.

The Appeals Council elected to review the ALJ's fully favorable decision on its own initiative (*id.* at 301-06). *See* 20 C.F.R. § 404.969(a) ("Anytime within 60 days after the date of a decision or dismissal that is subject to review under this section, the Appeals Council may decide on its own motion to review the action that was taken in your case."). It subsequently

---

sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567.

entered an order remanding the case to the ALJ with instructions on further proceedings (A.R. at 193-97). *See* 20 C.F.R. § 404.977. The remand order, explaining that the ALJ's decision was not supported by substantial evidence, identified four issues that needed further development and enumerated five specific actions that the ALJ should take on remand.

Plaintiff's primary contention before this court is that the Appeals Council decision to review and then remand the ALJ's initial, fully favorable decision was politically motivated rather than a response to an insufficiency of evidence supporting the decision, and was, therefore, arbitrary and capricious (Dkt. No. 15 at 7-9). An initial barrier to this contention is that the First Circuit has held "that an Appeals Council order remanding a case to the ALJ for further proceedings is not an appealable final decision." *Weeks v. Soc. Sec. Admin. Comm'r*, 230 F.3d 6, 7 (1st Cir. 2000) (per curiam); *see also Duda v. Sec. of Health & Human Servs.*, 834 F.2d 554 (6th Cir. 1987) (Appeals Council remand order was not a final appealable order).

In *Weeks*, the plaintiff was attempting to appeal directly from the remand order, while here Plaintiff seeks review of the remand order in the context of his appeal from the ALJ's subsequent denial of benefits. That, however, is a distinction without a difference. In *Martinez v. Barnhart*, 444 F.3d 1201 (10th Cir. 2006), the United States Court of Appeals for the Tenth Circuit considered a case in a posture identical to the posture of this case. The Tenth Circuit rejected plaintiff's challenges to the validity of the remand order, observing that a remand order is not a final decision of the Appeals Council, which is reviewable by a district court, and that the governing regulations afford the Appeals Council wide latitude to make a decision that changes the outcome of a case, or to remand a case to the administrative law judge. *Id.* at 1205 (Appeals Council remand on basis that ALJ's credibility finding was not based on substantial evidence was not reviewable).

It is true that *Weeks* left open the possibility of a narrow avenue for judicial review of a remand order in the event that the Appeals Council's "action [wa]s challenged on constitutional or related procedural grounds." *Weeks*, 230 F.3d at 8 n.1. Plaintiff apparently alleges that the Appeals Council's own-motion review in this case was in violation of his due process rights because it resulted from a 2011 program of decision reviews implemented to address concerns about nonadherence to policy by some ALJs with high reversal rates (Dkt. No. 15 at 8). Assuming solely for the sake of argument that such a claim might be cognizable, Plaintiff has not made the requisite showing in this case. Under federal law, a court's review of administrative agency action is governed by the provisions of the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"). Under the APA, agency action may be set aside only if that action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, or if the action failed to meet statutory, procedural, or constitutional requirements. *See Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 331 (D. Mass. 2005). "Specifically, '[t]he task of a court reviewing agency action under the APA's arbitrary and capricious standard is to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (quoting *Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 202 (1st Cir. 1999) (internal punctuation and citations omitted)). In conducting such a review, the court affords substantial deference to the agency's decisions. *See id.* Plaintiff bears the burden of establishing that the agency acted arbitrarily or capriciously, or otherwise abused its discretion. *See id.* (citing *Alliance to Protect Nantucket Sound, Inc. v. U.S. Dep't of the Army*, 288 F. Supp. 2d 64, 71 (D. Mass. 2003)).

Plaintiff has not met his burden of establishing a factual predicate for his claim that the Appeals Council selected the ALJ's favorable decision in this case as part of a 2011 review of ALJs "with outlier reversal rates" (Dkt. No. 15 at 8). The fully favorable decision was issued in 2014. The court has nothing before it, aside from Plaintiff's conclusory assertion, establishing that the 2014 favorable decision was entangled in a program review that, according to Plaintiff, was initiated in 2011 (Dkt. No. 15 at 8).[5] Plaintiff has not shown that the ALJ who issued the initial favorable decision in Plaintiff's case has an usually high reversal rate (or for that matter, denial rate) or was ever the subject of any targeted review based on his allowance or denial rate. Indeed, as a means of protecting the judicial independence of ALJs, SSA regulations provide that neither its random sampling procedures nor its selective sampling procedures permit identification of ALJ decisions for pre-effectuation review based on the identity of the ALJ or the location of the office issuing the decision. *See* 20 C.F.R. § 404.969(b)(1).

Moreover, the decision to select Plaintiff's case for pre-effectuation review does not, on its face, appear arbitrary, capricious, or an abuse of discretion. SSA regulations provide that the Appeals Council "will use selective sampling to identify cases that exhibit problematic issues or fact patterns that increase the likelihood of error." 20 C.F.R. § 404.969(b)(1). This is such a case. As result of a car accident, Plaintiff's left arm was amputated, and he has understandably wrestled with depression and anxiety following this very distressing loss. But it was clear from

---

[5] The cases that Plaintiff cites, *W.C. v. Heckler*, 629 F. Supp. 791 (W.D. Wash. 1985), *aff'd sub nom W.C. v. Bowen*, 807 F.2d 1502 (9th Cir.), *opinion amended on denial of rehearing*, *Stieberger v. Heckler*, 615 F. Supp. 1315 (S.D.N.Y. 1985), *vacated sub nom Stieberger v. Bowen*, 801 F.2d 29 (2d Cir. 1986), address the so-called "Bellmon Program" of review of ALJ decisions, which has not been in effect for many years, and has not been shown to have played any role in the Appeals Council's decision to review Plaintiff's case. *See Ass'n of Admin. Law Judges, Inc. v. Heckler*, 594 F. Supp. 1132 (D.D.C. 1984).

the record that he was the driver, he was intoxicated, and he was convicted on criminal charges arising from the accident. When the Appeals Council selected his case for review, its initial concern was "the nature of [Plaintiff's] conviction relating to the motor vehicle accident at the time of [his] alleged onset date" (A.R. at 302). As the Appeals Council stated in its notice informing Plaintiff that his case had been selected for review, if Plaintiff had been convicted of a felony, the SSA could not "consider any physical or mental impairment, or any increase in severity (aggravation) of a preexisting impairment, which arises in connection with [a claimant's] commission of a felony." 20 C.F.R. § 404.1506(a). The Appeals Council noted apparently conflicting evidence in the record about whether Plaintiff's conviction was for a felony or a misdemeanor (A.R. at 302). While this possible legal error by the ALJ was resolved in Plaintiff's favor – he was convicted of a misdemeanor – it was not arbitrary, capricious, or an abuse of discretion for the Appeals Council to select Plaintiff's case for pre-effectuation review based on this possible error of law.

The Appeals Council remand order left the outcome of the case up to the ALJ and authorized the ALJ to do anything he deemed necessary to complete his review of the claim (A.R. at 191, 196). To the extent Plaintiff implies that the ALJ was somehow improperly influenced or biased the second time around by the fact of remand (Dkt. No. 15 at 10-11), this court starts with the "presumption that administrators are 'men [and women] of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.'" *Brasslett v. Cota*, 761 F.2d 827, 837 (1st Cir. 1985) (quoting *Withrow v. Larkin*, 421 U.S. 35, 56 (1975)). Plaintiff, whose burden it is, *see, e.g., id.* (a plaintiff bears the burden of overcoming the presumption that his or her case was decided by an honest and impartial adjudicator), cannot overcome the presumption of fairness in this case, where the

hearing transcript shows the ALJ urging Plaintiff's counsel to help the ALJ make a finding of disability and award benefits by pointing to or submitting evidence that would support such a finding and award and encouraging Plaintiff to assist his attorney in achieving this goal (A.R. 53-61, 77-78).

    2.   <u>The ALJ's Decision After Remand was Supported by Substantial Evidence.</u>

Plaintiff's contention that the ALJ's opinion after remand was not supported by substantial evidence also fails. There is no dispute here about the significant physical limitations arising from the amputation of Plaintiff's left arm. Nonetheless, the ALJ noted, Plaintiff's primary care physician stated that Plaintiff could likely work a full day with only one arm, although not at his past work (*id.* at 32), and the V.E. identified a job that exists in substantial numbers in the national economy that the Plaintiff could perform despite the loss of his arm (*id.* at 39). Thus, the question before the ALJ was whether functional limitations caused by Plaintiff's depression and anxiety, added to his physical limitations, were disabling. The ALJ answered that question in the negative. There is substantial evidence in the record to support that conclusion.

"[J]ust because [Plaintiff] suffers from depression and anxiety simply does not mean, a fortiori, that []he has any impairment or combination of impairments which significantly limits [his] . . . mental ability to do basic work activities." *Torres v. Barnhart*, 249 F. Supp. 2d 83, 97 (D. Mass. 2003). The record does not include an opinion from any of Plaintiff's treating mental health care providers in which such a provider assessed Plaintiff's functional limitations attributable to his depression and anxiety. Notwithstanding the ALJ's effort to fill this gap by keeping the record open for 30 days after the second hearing, this remained the state of the evidence before the ALJ. Thus, there was no opinion evidence supporting a finding of disability

that would potentially have been entitled to controlling weight pursuant to the treating physician rule, nor was there such opinion evidence from any treating mental health care provider. *See Viveiros v. Astrue*, Civil Action No. 10-11405-JGD, 2012 WL 603578, at *8 (D. Mass. Feb. 23, 2012) (noting absence of treating provider opinion evidence addressing severity of the plaintiff's condition); SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996) (controlling weight is typically afforded to a treating physician's opinion on the nature and severity of an impairment where the opinion is well-supported); *contrast, e.g., Nguyen*, 172 F.3d at 35 (remanding a case where the ALJ did not adequately justify the rejection of an uncontroverted medical opinion of incapacitation by severe pain from a treating health care provider).

On the other hand, there was substantial evidence, on which the ALJ was entitled to rely, that supported his finding that, while Plaintiff had functional limitations caused by depression and anxiety, his mental health impairments were not disabling. While the record shows that Plaintiff was diagnosed with depression and anxiety, he "was treated conservatively, demonstrated no suicidal or homicidal thinking, and there is no record of any hospitalization for that condition." *Ramos v. Barnhart*, 119 Fed. Appx. 295, 296 (1st Cir. 2005) (per curiam; unpublished); *see also Arruda v. Barnhart*, 314 F. Supp. 2d 52, 72 (D. Mass. 2004) (ALJ properly relied on assessment that plaintiff's treatment had been conservative). Examination notes reported that Plaintiff's appearance, speech, alertness, thought processes, and behavior were normal (e.g., A.R. at 575, 657, 665). *See Ramos*, 119 Fed. Appx. at 296; *Torres*, 249 F. Supp. 2d at 96.

The ALJ noted that, in the setting of appropriate treatment in the form of medication and therapy, Plaintiff had generally exhibited only a moderate degree of overall mental impairment (A.R. at 37). Treatment notes from Ms. Eckert and Ms. Sachs supported this conclusion. Ms.

Eckert diagnosed Plaintiff with depression of mild to moderate severity that was responding well to Zoloft (*id.* at 657). Beginning in July 2015, notes made by Ms. Sachs reflected that Plaintiff had fewer depressive symptoms and that he reported being more socially active (*id.* at 790, 792, 794, 796, 798).

In the absence of any mental RFC analysis prepared by an acceptable medical source or any other treating provider, the ALJ properly placed substantial weight on the limitations assessed following the consultative interview and testing conducted by Dr. Cattanach, and on the opinion of Dr. Lukens, the state DDS examiner (*id.* at 38). *See, e.g., Ramos*, 119 Fed. Appx. at 296-97 ("[I]t was appropriate for the ALJ to rely on the reports of the consultative and non-examining physicians in assessing [claimant's] RFC"); *Coggan v. Barnhart*, 354 F. Supp. 40, 54 (D. Mass. 2005) (an ALJ should consider the findings of non-examining sources, and may place significant weight on medical opinions from experts appointed by the Commissioner). "Consultative evaluations, while not entitled to controlling weight, must still be taken into consideration and given an appropriate weight in light of other evidence in the record." *Jimenez v. Colvin*, Civil No. 13-1411 (BJM), 2014 WL 2931689, at *10 (D.P.R. June 30, 2014) (citing *Traynham v. Astrue*, 925 F. Supp. 2d 149, 160 (D. Mass. 2013)). The ALJ explained that he gave substantial weight to Dr. Cattanach's opinion because she conducted a thorough mental status examination of Plaintiff and her opinion was supported by objective medical findings (A.R. at 38). The ALJ's RFC assessment is consistent in all respects with Dr. Cattanach's opinion, and is, therefore, supported by substantial evidence. *See Faraone v. Colvin*, No. CA 13-073 ML, 2014 WL 877064, at *9 (D.R.I. Mar. 5, 2014) (citing *Rivera-Torres v. Sec'y of HHS*, 837 F.2d 4, 5 (1st Cir. 1988)).

To the extent Plaintiff contends that the decision is not supported by substantial evidence because the ALJ reassessed the weight he accorded to the opinion evidence from Dr. Lukens, the non-examining, non-testifying DDS mental health reviewer, this contention fails because this reevaluation was in accordance with the instructions from the Appeals Council. "On remand, an ALJ 'shall take any action that is ordered by the Appeals Council and may take additional action that is not inconsistent with the Appeals Council's order.'" *Cook v. Berryhill*, Civil Action No. 14-40112-DHH, 2017 WL 1135221, at *11 (D. Mass. Mar. 27, 2017) (quoting 20 C.F.R. § 404.977(b)). The Appeals Council instructed the ALJ to, among other things, give further consideration to Plaintiff's maximum RFC and provide an appropriate rationale with specific references of record to support any assessed limitations (A.R. at 195). There is nothing in the Appeals Council's remand order that precluded the ALJ from assigning a different weight to the opinion of Dr. Lukens on reconsideration. *See Cook*, 2017 WL 11335221, at *11 (on remand, the ALJ was free to reevaluate opinions from medical sources as he saw fit, as long as the reevaluation was consistent with the Appeals Council remand order).

Dr. Lukens evaluated Plaintiff's claim in October of 2013 (A.R. at 162). Accordingly, his opinion did not take into account medical evidence that was added to the record after remand. It can be reversible error for an ALJ to rely on the RFC assessment of a non-examining expert who has not analyzed the complete medical record. *See Blackette v. Colvin*, 52 F. Supp. 3d 101, 113 (D. Mass. 2014). "This is not a *per se* rule, though." *Id.* If recent records do not indicate a substantial change (particularly a change for the worse) in a claimant's condition, and "the older evidence 'remains accurate,' it may be relied upon." *Id.* (quoting *Abubakar v. Astrue*, No. 1:11-cv-10456-DJC, 2012 WL 957623, at *12 (D. Mass. Mar. 21, 2012)).

Here, the ALJ explained that he assigned substantial weight to the opinion of Dr. Lukens because Dr. Lukens' opinions about Plaintiff's mental health impairments and the functional limitations resulting from those impairments were consistent with other evidence in the record (A.R. at 38). The records bear out this finding by the ALJ. Dr. Lukens agreed that the records reflected a diagnosis of affective disorder that qualified as severe (*id.* at 156). He assessed Plaintiff's functional limitations based on his review of Dr. Bekken's consultative examination report and records from ACC (*id.* at 152-53). Treatment records related to Plaintiff's mental health submitted to the SSA after remand did not reflect a deterioration in Plaintiff's mental health status. Rather, the records show that Plaintiff's therapist, Ms. Sachs, diagnosed recurrent depression of moderate severity. Beginning in or around July 2015, her notes reflect "notable" improvement in Plaintiff's mood and affect. Records from Ms. Eckert, who managed Plaintiff's medications for depression, reflect that she also diagnosed a depressive disorder of moderate severity with normal thought processes and affect. Thus, the evidence on which Dr. Lukens relied remained accurate as an indicator of Plaintiff's mental health status after remand.

Even if there were error in the ALJ's reliance on Dr. Lukens' opinion, which there was not, any such error would be harmless and would not warrant remand. *See Ward v. Comm'r of Social Security*, 211 F.3d 652, 656 (1st Cir. 2000) (citing *Dantran, Inc. v. United States Dep't of Labor*, 171 F.3d 58, 73 (1st Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) ("[A] remand is not essential if it will amount to no more than an empty exercise.")). Dr. Lukens' opinion about Plaintiff's functional limitations was substantially consistent with Dr. Cattanach's assessment. Dr. Lukens was less restrictive than Dr. Cattanach in his view of Plaintiff's ability to interact with the general public, which he deemed was not significantly limited. Dr. Cattanach opined that Plaintiff could not tolerate sustained contact with the general public (A.R. at 669).

The ALJ's RFC assessment reflects the more conservative position taken by Dr. Cattanach (A.R. at 31) (Plaintiff "is limited to occasional interaction with the public"). First, Plaintiff has not shown that the ALJ erred in his reliance on the Dr. Lukens' opinion evidence. Second, to the extent he relied on Dr. Lukens' opinion, any such reliance did not result in restrictions that were inconsistent with Dr. Cattanach's opinions. Thus, the error, "if any, which could be ascribed to the ALJ for relying on [Dr. Lukens'] opinion is harmless." *Cook*, 2017 WL 1135221, at *13.

      3.  <u>Treating Provider Records Did Not Substantiate Any 12-Month Period of Disabling Mental Limitations</u>.

Lastly, Plaintiff contends that evidence from Plaintiff's "treating psychiatric source indicates ongoing treatment for psychiatric illness which has at times been associated with a severe reduction in functional capacity" (Dkt. No. 15 at 11). Plaintiff identifies neither the treating source nor the evidence to which he refers (*id.*). The record does not support this contention.

Ms. Marhefka, an APRN, assigned Plaintiff GAF scores of 50 on each of the four occasions on which she saw him between October 12 and December 31, 2012. A GAF score of 41-50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) *or* any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders at 34 (4th ed. 1994) ("DSM-IV"). The SSA has stated that it will continue to receive and consider GAF scores as it would other opinion evidence, with the caveat that an ALJ may only give a GAF score significant weight if that score has supporting evidence. *See Bourinot*, 95 F. Supp. 3d at 178; *Kroh*, 2014 WL 4384675, at *18. To be sure, in the aftermath of the accident, facing the loss of his left arm and criminal charges, Ms. Marhefka's notes reflect that Plaintiff's mood was depressed and his energy and interests had decreased, but

her notes provide scant, if any, supportive evidence for a GAF score of 50. Rather, her notes reflect that Plaintiff's appearance, speech, alertness, attention, and memory all appeared normal, and that he was not suffering from delusions or hallucinations.

Perhaps more significantly, these scores cover a period of only two and a half months, and are not sufficient as evidence of a disability "which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); 42 U.S.C. § 423(d)(1)(A). Plaintiff was a no show on January 23, 2013 for what was apparently his last scheduled appointment with Ms. Marhefka (A.R. at 590). Some six months later, on June 27, 2013, Ms. Sachs conducted an examination of Plaintiff in which she judged that his mental status was in all respects within normal limits (*id.* at 575). Ms. Sachs assigned Plaintiff a GAF score of 58 (*id.* at 579). A GAF score between 60 and 51 represents a judgment that an individual has "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks, *or* moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34. On the basis of single encounter consultative examinations conducted in September 2013, Drs. Jaffee and Bekken assigned Plaintiff GAF scores of 51 and 50, respectively. Dr. Bekken assessed the severity of Plaintiff's depression based on his self-report of his symptoms, and characterized her GAF score of 50 as an estimate (*id.* at 649). The remaining treatment records, from Ms. Eckert and Ms. Sachs, reflecting appointments in 2014 and 2015, are devoid of evidence of disabling depression or anxiety.

Even assuming that the GAF scores recorded by Ms. Marhefka provided sufficient objective evidence of disabling depression to support a finding of disability at any relevant time, which is doubtful, the longitudinal record does not, as the Appeals Council noted "contain documentation substantially supporting any 12-month period of disabling mental limitations" (*id.*

at 194).  The ALJ did not err in his evaluation of the treating provider records.[6]

V.     Conclusion

For the reasons stated, Plaintiff's Motion for Order Reversing the Commissioner's

Decision (Dkt. No. 14) is DENIED, and the Commissioner's Motion for Order Affirming

Decision of Commissioner (Dkt. No. 21) IS GRANTED.  A judgment shall enter for the

defendant, and the Clerk's Office is directed to close the case.

It is so ordered.

Dated: Sept. 29, 2017                                        /s/ Katherine A. Robertson
                                                             KATHERINE A. ROBERTSON
                                                             United States Magistrate Judge

---

[6] In the absence of any supporting evidence, Plaintiff's counsel's suggestion in his memorandum
that Plaintiff's mental health has recently deteriorated (Dkt. No. 15 at 11), cannot support a
remand pursuant to sentence six of 42 U.S.C. §405(g).  Plaintiff bears the burden of producing
*evidence*, meaning medical records or reports of evaluations, to support a sentence six remand.
*See Benitez v. Astrue*, Civil Action No. 11-30021-KPN, 2011 WL 6778534, at *5 (D. Mass. Dec.
20, 2011).  If there has been a lengthy confinement to a mental hospital since the date of the
ALJ's February 22, 2016 decision, Plaintiff can apply prospectively for benefits based on
evidence that his condition has deteriorated.  *See Grady v. Astrue*, 894 F. Supp. 2d 131, 144 n.9
(D. Mass. 2012).